IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                      No. CR 14-0259 JB

OMAR CERVANTES-CHAVEZ,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Exception to Pre-Sentence Report and Request for Evidentiary Hearing, filed June 27, 2014 (Doc. 20)("Objections").  The Court held a hearing on September 12, 2014.  The primary issues are: (i) whether to apply the cross-reference provision of the guideline for being an illegal alien in possession of a firearm and calculate Defendant Omar Cervantes-Chavez' sentence under the drug-possession guideline, even though Cervantes-Chavez' crime of conviction was being an illegal alien in possession of a firearm; (ii) whether the Court should calculate Cervantes-Chavez' base offense level under the drug-possession guideline using only the actual weight of marihuana discovered at the scene or should additionally consider the drug-weight equivalent of $19,652.00 cash found at the scene; (iii) whether the Court should apply a 2-level enhancement for possessing a dangerous weapon, even though said possession is a necessary element of Cervantes-Chavez' crime of conviction; (iv) whether the Court should apply a 2-level enhancement for being an "organizer, leader, manager, or supervisor," where there is no direct evidence that Cervantes-Chavez organized the activities of other members of a criminal organization, and where only his relevant conduct -- and not his crime of conviction, possessing firearms as an illegal alien -- is the subject of any

alleged criminal organizational activity; and (v) whether the Court should vary Cervantes-Chavez' sentence downward to reflect impending changes to the Guidelines which indicate a more lenient sentence for drug offenders than the current Guidelines.  The Court will cross reference to the drug-possession guideline, because the Court may consider all of Cervantes-Chavez' relevant conduct, and the Court finds by a preponderance of the evidence that Cervantes-Chavez committed the crime of illegal drug possession as 21 U.S.C. § 841(a)(1) defines that offense.  The Court will convert the $19,652.00 in currency found at the scene into its drug-weight equivalent, because there is sufficient evidence -- namely, that the bulk of this enormous quantity of money was found, in cash, in a container in the same shed in which the marihuana was stowed -- that the money is attributable to drug sales.  The Court will also apply the 2-level enhancement for possessing a dangerous weapon, because using an essential element of the defendant's crime of conviction to trigger an enhancement under the Guidelines does not constitute double counting.  The Court will not, however, apply the 2-level enhancement for being an organizer, leader, manager, or supervisor.  Although the Court can apply such an enhancement even where the crime of conviction is unrelated to any criminal organization, the Court finds insufficient evidence that Cervantes-Chavez satisfies the requirements for an upward role adjustment, because there is no direct evidence that he organized the activities of other participants in a common criminal scheme.  Last, the Court will grant Cervantes-Chavez a downward variance so that his sentencing range will match the one he would receive under the impending changes to the Guidelines, and the Court will impose a sentence at the bottom of that range: 37-months imprisonment.

## FACTUAL BACKGROUND

The Court takes its facts from the Presentence Investigation Report, disclosed March 26, 2014 ("PSR"), that the United States Probation Office ("USPO") prepared.  On October 11, 2013, government agents in Silver City, New Mexico discovered a pickup truck containing one hundred pounds of marihuana in concealed compartments in the truck bed.  See PSR ¶ 12, at 4. The driver of the truck, a confidential informant ("CI"), told the agents that the marihuana was to be delivered to a man named "Omar" who resided at 1712 Bonito Court, S.W., Albuquerque, New Mexico.  PSR ¶ 12, at 4.  This first name and address match those of Cervantes-Chavez. See PSR at 1-2.

The CI told the agents that he delivered marihuana to Cervantes-Chavez every two to three weeks.  See PSR ¶ 13, at 4.  The agents sent the CI to make the 100-pound delivery as scheduled and obtained a search warrant for Cervantes-Chavez' residence.  See PSR ¶ 12-13, at 4.  As the CI and Cervantes-Chavez were beginning to unload the marihuana from the truck bed, agents moved in and detained the two individuals.  See PSR ¶ 14, at 4.  The agents recovered: (i) the 100 pounds of marihuana compressed into bricks in the bed of the truck; (ii) an additional seventy-five pounds of marihuana in a storage shed outside Cervantes-Chavez' residence; (iii) $19,000.00 in cash in a white cylindrical container in the same shed; (iv) an additional $625.00 in cash on Cervantes-Chavez' person; and (v) two pistols and one rifle inside the residence.  See PSR ¶¶ 15-18, at 4-5.  Cervantes-Chavez has no prior criminal history.  See PSR ¶¶ 37-42, at 7-8.

## PROCEDURAL BACKGROUND

Cervantes-Chavez pled guilty to possessing a firearm as an illegal alien under 18 U.S.C. § 922(g)(5)(A).  See Plea Agreement, filed January 29, 2014 (Doc. 13); Clerk's Minutes for

Proceedings Held Before Magistrate Judge Robert H. Scott, filed January 29, 2014 (Doc. 14).

The USPO calculates that Cervantes-Chavez has a total offense level of 25 and a criminal history score of 0 -- equivalent to a criminal history category of I.  See PSR ¶¶ 35, 39, at 7.  The USPO calculates the offense level by first applying the guideline for the "unlawful receipt, possession, or transportation of firearms or ammunition."  U.S.S.G. § 2K2.1 (capitalization altered for readability).  See PSR ¶ 25, at 6.  The USPO then applies the cross-reference provision of that guideline, U.S.S.G. § 2K2.1(c)(1)(A), and uses the drug-possession guideline, U.S.S.G. § 2D1.1, for all subsequent calculations.  See PSR ¶ 25, at 6.

The USPO calculates that Cervantes-Chavez possessed 99.54 kilograms (219.45 pounds) of marihuana; it arrives at that calculation by adding the 79.38 kilograms (175 pounds) of marihuana found at the scene with 25.4 kilograms (fifty-six pounds) -- the "marijuana equivalency" of the $19,652.00 in "drug proceeds" found at the scene[1] -- and subtracting five percent of the total weight for packaging.[2]  PSR ¶ 20, at 5.  The USPO thus assesses a base offense level of 24 pursuant to U.S.S.G. § 2D1.1(c)(8), which applies to cases involving "[a]t least 80 KG but less than 100 KG  of Marihuana."  PSR ¶ 25, at 6.  It then applies a 2-level enhancement for using a dangerous weapon, see PSR ¶ 26, at 6 (citing U.S.S.G. § 2D1.1(b)(1)), and another 2-level enhancement for Cervantes-Chavez' alleged role as an organizer, leader,

---

[1]The USPO asserts that the going rate for "Mexican marijuana" is $350.00 per pound. PSR ¶ 20, at 5.  It divides the $19,652.00 in cash by $350.00/lb. to obtain a drug equivalent of 56 pounds.  See PSR ¶ 20, at 5.  The USPO does not explain where it got its $350/lb. conversion factor, but, as no party has disputed its accuracy, the Court will accept the USPO's conversion factor.

[2]The Court notes that the 5% decrease for packaging was applied to both the weight of the marihuana found at the scene and the weight equivalent of the money found at the scene. The Court does not know whether this calculation was correct -- i.e., whether the $350.00/lb. figure that the USPO gives for Mexican marihuana refers to packaged marihuana or unpackaged marihuana -- but, as Plaintiff United States of America has not objected, the Court will assume that the USPO was correct.

manager, or supervisor, see PSR ¶ 29, at 6 (citing U.S.S.G. § 3B1.1(c)).  The USPO bases the role adjustment on the fact that Cervantes-Chavez "was responsible for accepting and storing loads of marijuana and currency related to the drug transactions," and that he "had acted in this capacity for over a year."  PSR ¶ 29, at 6.  The USPO then decreases the offense level by 3 levels for Cervantes-Chavez' acceptance of responsibility, resulting in a final offense level of 25.  See PSR ¶¶ 33-35, at 7.

Cervantes-Chavez filed his Objections three months after the disclosure of the PSR.  See Objections at 1.  He lodges five objections to the PSR.  First, he argues that the Court should not apply the cross-reference provision, but should instead calculate his offense level fully under the illegal alien-in-possession guideline.  See Objections passim.  It is not clear whether this contention is a standalone argument or just a rhetorical flourish to make the points that: (i) the role adjustment has little to do with his crime of conviction, as the criminal organization of which Cervantes-Chavez is a part is a drug organization and not an illegal alien-in-possession organization; and (ii) the adjustment for possessing a dangerous weapon is unfair in light of his crime of conviction necessarily requiring possession of a dangerous weapon.

Second, Cervantes-Chavez argues that, even if the Court rejects his first argument and cross references to the drug-possession guideline, it should apply a base offense level of 22, which reflects the 79.38 KG of marihuana actually discovered, and not a base offense level of 24, which would reflect the 99.54 KG figure that includes the addition of the marihuana weight equivalent of the $19,652.00 in cash discovered at the scene.  See Objections at 3-4.  His argument is not that money-to-drug-weight conversions are per se prohibited, but rather that there is insufficient evidence -- and Cervantes-Chavez contends that the Court should require clear and convincing evidence -- to conclude that the money found at the scene was drug

proceeds.  See Objections at 3-4 ("There is no indication as to whether the amount of money located was there strictly as to some drug transaction related to the marijuana or whether it was an amount accumulated from other sources.").

Third, Cervantes-Chavez argues that the Court should not apply the 2-level enhancement for possessing a dangerous weapon, presumably because that would constitute double-counting with his crime of conviction.  See Objections at 5.  He outlines the alleged unfairness as follows:

> If the court attributes the drug amounts, as converted including the cash, then that would place Mr. Cervantes at a level 24.
>
> However, the PSR writer then goes back to treat the drug offense as the "offense" conduct not whether it's a gun offense.  Having[] converted to the highest level the writer tries to include an additional 2 points for guns being used in an offense for which the defendant is not convicted and in fact which becomes the offense conduct not for the idea of his relevant conduct but for purposes of calculating an offense level that is higher if the underlying offense level for the gun possession is lower.

Objections at 5.

Fourth, Cervantes-Chavez argues that the Court should not apply the 2-level enhancement for being an organizer, leader, manager, or supervisor, both because it reflects an enhancement of a crime other than his crime of conviction, and because he does not meet the standard's factual requirements.  See Objections at 2-4.  This argument, thus, has two alternative halves: first, that Cervantes-Chavez was not an organizer, leader, manager, or supervisor of any criminal organization, even one committed to the drug trade; and second, that even if Cervantes-Chavez is an organizer of a drug organization, the role adjustment would still be inapplicable, because his crime of conviction did not involve drugs.  Cervantes-Chavez never fleshes out the first half of this argument, stating only: "The Pre-Sentence writer requests this court to grant a two level increase in the offense category for being a leader or organizer of the offense for which he was convicted.  But the offense of conviction is that of the illegal possession of firearms not a

- 6 -

drug trafficking offense."   Objections at 2.   As to the second half of the argument -- that Cervantes-Chavez is not a leader, organizer, manager, or supervisor, even of a drug organization -- he asserts that the USPO never discusses any of the "elements" of U.S.S.G. § 3B1.1, found in the commentary, see Objections at 3, and that "Cervantes-Chavez was no more than a mule," Objections at 4.

Last, Cervantes-Chavez argues that the Court should depart or vary downward to reflect the more-lenient Guidelines, which the Commission has approved but which have not yet come into effect.   See Objections at 8.   He asserts that the application of the impending Guidelines would result in a base offense level of 20.   See Objections at 8.

Plaintiff United States of America responded to the Objections within a month, defending all of the USPO's positions in the PSR.   See United States' Response to Defendant's Exception to Pre-Sentence Report and Request for Evidentiary Hearing Filed on June 27, 2014 (Doc. 20) at 5-7, filed July 17, 2014 (Doc. 23)("Response").   It defends the role adjustment as follows:

> Defendant received a two-level upward role adjustment pursuant to U.S.S.G. § 3B1.1(c).   He argued that this was improperly applied as he was a mere mule.   He states in his Objection to the PSR that he merely held money and drugs.   This statement is biased and self-serving in order to argue for a lesser guideline imprisonment range and sentence.   According to the PSR, HSI investigation, and Defendant's admissions as stated above, Defendant was observed by law enforcement unloading the Avalanche truck which was delivering approximately 100 pounds of marijuana stored in hidden compartments to Defendant's residence.   Another approximately 75 pounds of marijuana were stored in the shed located within the carport of Defendant's residence, both in bricks and uncompressed form.   $19,000.00 was seized from this shed, even though Defendant stated this money was not his.   $652.00 was seized from Defendant's person.   The CI informed law enforcement that it delivers marijuana to Defendant once every week or two.   Through HSI investigation, it believes Defendant to be a facilitator or middle man.   Three firearms were seized from inside Defendant's residence.   Defendant admitted he is an illegal alien, and possessed a false Social Security card bearing his name.   While Defendant may not be the ultimate leader or organizer in this DTO to warrant a four-level increase pursuant to U.S.S.G. § 3B1.1(a), the United States argues that Defendant was properly assessed as a lower level leader or organizer within this DTO

pursuant to U.S.S.G. § 3B1.1(c), and a two-level enhancement was properly assessed and warranted.

Response at 6-7 (citations omitted).  The United States also notes that it does not oppose a downward variance to put Cervantes-Chavez' sentence in line with the impending Guidelines.  See Response at 3.

The Court held a hearing on September 12, 2014.  See Transcript of Hearing (taken September 12, 2014)("Sept. 12, 2014 Tr.").[3]  The Court alerted the United States that the Court had serious doubts whether the role adjustment was warranted, see Sept. 12, 2014 Tr. at 6:4-7:1 (Court, Wang), and, in response, the United States elected to put on two witnesses to provide evidentiary support for the enhancement, see Sept. 12, 2014 Tr. at 7:13-28:7 (Court, Wang, Grant, Juarez, Barahona).  It first called Jacob Grant, a detective with the Albuquerque Police Department ("APD").  See Sept. 12, 2014 Tr. at 7:11-12 (Wang).  Grant described the events leading up to Cervantes-Chavez' arrest, and then opined, based on his ten years of experience with APD, see Sept. 12, 2014 Tr. at 11:16-19 (Wang, Grant), that Cervantes-Chavez was carrying too much money and drugs to be a mere mule:

> Q.     And pursuant to your 10 years of training and experience with APD, that's Albuquerque Police Department, with this amount of drugs and firearms and money and pursuant to the totality of the circumstances, is Mr. Cervantes Chavez a mere mule?
>
> A.     No, ma'am.
>
> Q.     Why is that?
>
> A.     He is more of a distribution hub[.  A] mule takes drugs from one place to another.  Mr. Cervantes Chavez had drugs, individually broken up into sections inside of his shed, as well as having firearms and a large amount of

---

[3]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

money.  Typically a mule simply takes drugs from one place to another and then is paid for, like a truck driver, taking the narcotics from one place to another. However in this circumstance, I believe that his source of revenue was not because he was storing [or] transferring drugs it was because he was actually wholesaling them.

> Q.    And let me ask you, you just testified that there were packages of marijuana?

> A.    Yes.

> Q.    Can you explain to the Court pursuant to those packages the size and so on, what made you think that he was selling as well, not just a hub?

> A.    Well, they're one pound packages that were packaged differently[.] The ones that came off the truck were imagined differently than the ones that came out of the shed.

> Q.    You're going to have to explain that?

> A.    Well there was brown packages and then black packages that looked like a brick and weighed approximately one pound a piece, that were appeared to be broken up into separate bins as if they were being sorted and prepared to be possibly sold or given to another source.

Sept. 12, 2014 Tr. at 15:6-16:16 (Wang, Grant).

On cross examination, Cervantes-Chavez flushed out that the agents had recovered no

packaging materials, drug ledgers, "crib sheets," or bank account information from the scene.

Sept. 12, 2014 Tr. at 17:17-18:20 (Juarez, Grant).  Cross examination also elicited the following

exchange:

> Q.    So what information you did have was the confidential informant told you that he did what again that he delivered drugs to that particular house, correct?

> A.    Yes, sir.

> Q.    That's all he did?

> A.    The informant, yes, sir.

Q.      Did he tell you what role Mr. Chavez played other than accepting the drugs?

A.      No, sir he did not.

Q.      That's the only role you [know of] that Mr. Chavez played, correct that you know [of]?

A.      That I know of, yes.

Sept. 12, 2014 Tr. at 19:12-24 (Juarez, Grant).

The United States next called Frank Barahona, a special agent with Homeland Security Investigations ("HSI"), the investigative branch of the Immigration Customs Enforcement Bureau.  See Sept. 12, 2014 Tr. at 20:14-21:6 (Wang, Court, Barahona).  Barahona first testified about how the $350.00/lb. conversion factor was obtained, asserting that the price of one pound of marihuana in Albuquerque is approximately $500.00 but that the price sinks to roughly $345.00/lb. when multiple pounds are purchased, and the $350.00/lb. figure represents a "happy medium" price.  Sept. 12, 2014 Tr. at 21:22-22:17 (Barahona, Wang).  Barahona testified that the USPO got its figure from HSI.  See Sept. 12, 2014 Tr. at 21:14-22:4 (Wang, Barahona).

Barahona also testified that, "based on [his] background and experience, . . . Cervantes[-]Chavez is not a mule."  Sept. 12, 2014 Tr. at 23:17-18 (Barahona).  Barahona based this conclusion on three facts: (i) that mules do not typically carry the amount of cash that Cervantes-Chavez was carrying, see Sept. 12, 2014 Tr. at 23:22-24:2 (Barahona); (ii) that mules typically "do not carry[] over 100 [p]ounds," Sept. 12, 2014 Tr. at 24:2-3 (Barahona); and (iii) that he "ha[s] not encountered mules with firearms in their possession," Sept. 12, 2014 Tr. at 24:4-5 (Barahona).  On cross examination, Cervantes-Chavez asked Barahona whether he found any drug ledgers or packaging material in Cervantes-Chavez' residence -- which he did not -- and whether he was aware of anyone in particular that Cervantes-Chavez was responsible for

supervising -- Barahona was not, and he could not name any members of the criminal organization other than Cervantes-Chavez and the CI.  See Sept. 12, 2014 Tr. at 25:4-16 (Juarez, Barahona); id. at 25:17-26:13 (Juarez, Barahona, Wang, Court).  Barahona also conceded that, although he suspected that the cash discovered at the scene was connected to the drug trade, he did not know for sure.  See Sept. 12, 2014 Tr. at 27:1-21 (Juarez, Barahona, Wang, Court).

The parties then reiterated the arguments that they made in their briefs, with the United States adding a reference to U.S.S.G. § 3B1.1 cmt. 2, which states that "[a]n upward departure may be warranted in the case of a defendant who did not organize, manage, or supervise another participant, but who nonetheless exercised management responsibility over the property, assets, or activities of [a] criminal organization."  Sept. 12, 2014 Tr. at 32:9-14 (Wang).  The Court then adjourned the hearing and set a time to reconvene on September 17, 2014.  See Sept. 12, 2014 Tr. at 38:18-39:2 (Court).

The parties and the Court reconvened on September 17, 2014.  See Transcript of Hearing (taken September 17, 2014)("Sept. 17, 2014 Tr.").  After the parties briefly rehashed the arguments from their briefs, the Court announced that it would convert the cash found at the scene to its drug-weight equivalent using the conversion factor that the USPO supplied and that the United States supported with evidence.  See Sept. 17, 2014 Tr. at 5:19-6:4 (Court).  The Court further stated that it would apply the cross-reference provision, but would grant Cervantes-Chavez a 2-level downward variance to reflect the range he would receive under the impending Guidelines.  See Sept. 17, 2014 Tr. at 6:4-8:8 (Court, Juarez, Probation Officer).

The Court clarified that Cervantes-Chavez' final offense level under the current Guidelines is 23, but that it would vary the offense level to 21 to reflect the impending Guidelines.  See Sept. 17, 2014 Tr. at 23:21-24:4 (Court).  The Court noted that, when combined

with his criminal history category of I, this offense level indicates a "working" Guidelines sentencing range of 37-46 months.  Sept. 17, 2014 Tr. at 24:2-5 (Court, Probation Officer).  The Court ran through the factors in 18 U.S.C. § 3553(a) and concluded that, other than the 2-level downward variance reflecting the impending Guidelines, which was already factored into the "working" Guidelines sentencing range, Cervantes-Chavez' circumstances did not justify any further variance.  See Sept. 17, 2014 Tr. at 24:11-15 (Court).  The Court imposed a sentence at the bottom of the varied Guidelines range, 37-months imprisonment, and, after verifying with the USPO that it had discretion to do so, declined to impose an period of supervised release.  See Sept. 17, 2014 Tr. at 24:19-25:1 (Court, Probation Officer).

## LAW REGARDING THE GUIDELINES

In United States v. Booker, the Supreme Court severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

    (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)    to afford adequate deterrence to criminal conduct;

    (C)    to protect the public from further crimes of the defendant; and

> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551. To achieve these purposes, 18 U.S.C. § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and the defendant's character; (iii) the available sentences; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines ranges are no longer mandatory, both the Supreme Court and the United States Court of Appeals for the Tenth Circuit have clarified that, while the Guidelines are one of several factors enumerated in 18 U.S.C. § 3553(a), they are entitled to considerable deference. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"). They are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses." United States v. Cage, 451 F.3d at 593 (internal quotation marks omitted). A reasonable sentence is one that also

"avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d 1261, 1264 (10th Cir. 2006).  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. 38, 46-47 (2007); Kimbrough v. United States, 552 U.S. 85, 90-91 (2007).  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory guideline sentence.  See Rita v. United States, 551 U.S. at 351; Gall v. United States, 552 U.S. at 46-47; Kimbrough v. United States, 552 U.S. at 90-91.

> While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence.  Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures.  The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, cmt. 1(H).  In United States v. Booker, the Supreme Court noted:

- 14 -

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis in original)(quoting 18 U.S.C. § 1951(a)). The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be determined" based on the following:

> (1)  (A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
>      (B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2)  solely with respect to offenses of a character for which [U.S.S.G.] § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3)  all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4)  any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not

resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards

lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may

rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence

standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.).

Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)[4]("The

district court's determination of 'relevant conduct' is a factual finding subject to a preponderance

of the evidence standard, and clear error review.").  The evidence and information upon which

the court relies, however, must have sufficient indicia of reliability.  See U.S.S.G. § 6A1.3 ("In

resolving any dispute concerning a factor important to the sentencing determination, the court

may consider relevant information without regard to its admissibility under the rules of evidence

applicable at trial, provided that the information has sufficient indicia of reliability to support its

probable accuracy.").

---

[4]United States v. Schmidt is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Schmidt, 353 F. App'x 132, (10th Cir. 2009)(unpublished), and United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), both have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Supreme Court precedent on relevant conduct comes primarily from two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997).  In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marihuana and cocaine into the United States, and in a 1991 attempt to import marihuana.  See 515 U.S. at 392-93.  In March, 1991, a federal grand jury indicted the defendant for attempting to possess marihuana with intent to distribute in association with the defendant's latter attempt to import narcotics.  See 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See 515 U.S. at 392-93. The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marihuana offense.  See 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit

acknowledged that its conclusion was contrary to other United States Courts of Appeals, including the Tenth Circuit, to have previously considered this question. See United States v. Witte, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit. See 515 U.S. at 395. In finding that the district court's consideration of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted." 515 U.S. at 401. The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense." 515 U.S. at 402. Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted. See United States v. Watts, 519 U.S. at 149. In reaching its result, the Supreme Court noted that its conclusion was in accord with every Court of Appeals other than the United States Court of Appeals for the Ninth Circuit, and that each Court of Appeals allowed sentencing courts to consider conduct for which the defendant had been acquitted, provided that the United States establishes that conduct by a

preponderance of the evidence.  See United States v. Watts, 519 U.S. at 149 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  18 U.S.C. § 3661.  See United States v. Watts, 519 U.S. at 151.  According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit case law adheres closely to the Supreme Court's holdings in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's

sentence mandatorily.'"[5]  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample

---

[5]The Tenth Circuit was referring to a sentencing court applying a sentencing factor that increased the maximum sentence the defendant could potentially receive, but the Supreme Court has since clarified that a sentencing factor must also be found by a jury if it raised the mandatory minimum sentence.  The Court explained in a previous case:

> Until recently, minimum sentences did not implicate the rule from Apprendi v. New Jersey at all.  In Harris v. United States, 536 U.S. 545 (2002), the Supreme Court upheld 18 U.S.C. § 924(c)(1)(A), which provides that, if a sentencing judge finds by a preponderance of the evidence that a defendant convicted of drug trafficking or a crime of violence had: (i) carried a firearm during the commission of the offense, then the minimum sentence the court may impose is five years, regardless whether the statute of conviction provides for a lower minimum; (ii) brandished a firearm, then the minimum sentence that the court may impose is seven years; and (iii) discharged a firearm, then the minimum sentence that the court may impose is ten years.  See 536 U.S. at 550-51.  The Supreme Court held that, although a fact must be proven beyond a reasonable doubt to a jury if it is to raise the maximum sentence that a defendant faces, judicial fact-finding may result in raising the mandatory minimum sentence without running afoul of the Sixth Amendment.  In Alleyne v. United States, 133 S. Ct. 2151, 2163 (2013), the Supreme Court overruled Harris v. United States, and held that a factual finding which will raise a defendant's minimum exposure must be made by a jury and found beyond a reasonable doubt.

United States v. Nolf, No. CR 10-1919-2 JB, 2014 WL 3377695, at *28 n.22 (D.N.M. June 20, 2014)(Browning, J.).

room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussing the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved. See 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." 947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant argued that the United States should prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence. See 11 F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life. The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required." 11 F.3d at 1515. Although the Tenth

Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard."  11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. 79, 84 (1986)).[6]

## LAW REGARDING VARIANCES FROM THE GUIDELINES

After United States v. Booker, the sentencing guideline ranges are now advisory[7] and are one of several factors set out in 18 U.S.C. § 3553(a).  Although appellate courts are allowed to

---

[6]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)).  See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  See United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument).

[7]Attorneys and courts often say that the "Guidelines" are advisory, but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  Gall v. United States, 522 U.S. at 46 ("As a result of our decision [in United States v. Booker], the Guidelines are now advisory[.]"); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding

that the Guidelines are advisory."). The Court must consider the guidelines, see Gall v. United States, 522 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the guideline range, see id. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated guideline range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2–3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

assume that within-guidelines sentences are reasonable, subject to rebuttal, see Gall v. United States, 552 U.S. at 50-51, the Supreme Court has made it clear that no presumption of reasonableness attaches at the district court level to the Guidelines sentencing ranges, see Gall v. United States, 552 U.S. at 50 (explaining that a sentencing judge "may not presume that the Guidelines range is reasonable"); Rita v. United States, 551 U.S. at 351 ("In determining the merits of [the parties'] arguments, the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply.").

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 18 U.S.C. § 3553(a)(2):

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)  to afford adequate deterrence to criminal conduct;
>
> (C)  to protect the public from further crimes of the defendant; and
>
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).   Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the sentencing guidelines and policy statements that the Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

---

United States v. Nolf, No. CR 10-1919-2, 2014 WL 3377695, at *20-21 (D.N.M. June 20, 2014)(Browning, J.)(emphasis in original).

In Kimbrough v. United States, the Supreme Court stated that, in the ordinary case, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'"  552 U.S. at 89 (quoting Rita v. United States, 551 U.S. at 350).  The Supreme Court recognized, however, that the sentencing judge is "in a superior position to find facts and judge their import under § 3553(a) in each particular case."  552 U.S. at 89.  Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-enters the United States so as to be able to provide for his two children and two siblings was not materially differentiated from other re-entry cases, and thus, no variance from the guidelines sentence was warranted.  See United States v. Alemendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767, at *12 (D.N.M. Dec. 14, 2010)(Browning, J.).  On the other hand, in United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), although Jager's military service was not present to an unusual degree and thus did not warrant a departure, the Court found that a variance was appropriate, because Jager's military service was "superior and uniformly outstanding," as Jager appeared to have been "trustworthy[] and dedicated, and he served with distinction."  2011 WL 831279, at *14.

## ANALYSIS

Cervantes-Chavez has lodged five objections to the PSR, the first three of which the Court will overrule and the last two of which the Court will sustain: (i) that the Court should not apply the cross-reference provision but should instead calculate his offense level fully under the illegal alien-in-possession guideline; (ii) that, even if the Court does cross reference to the drug-possession guideline, it should apply a base offense level of 22, which reflects the 79.38 kilograms of marihuana actually discovered, and not a base offense level of 24, which would reflect the 99.54-kilogram figure that includes the addition of a drug-weight equivalent of the

$19,652.00 in cash discovered at the scene; (iii) that the Court should not apply the 2-level enhancement for possessing a dangerous weapon, presumably because that would constitute double-counting with his crime of conviction; (iv) that the Court should not apply the 2-level enhancement for being an "organizer, leader, manager, or supervisor," both because it reflects his role in a crime other than his crime of conviction and because he does not satisfy the factual requirements of the standard; and (v) that the Court should depart or vary downward to reflect the more-lenient Guidelines which have been approved but have not yet come into effect.  The Court will reject Cervantes-Chavez' argument on (i) and will cross reference to the drug-possession guideline.  Cross references do not violate a defendant's Sixth Amendment rights, as the Court has previously explained in United States v. Sangiovanni, No. CR 10-3238 JB, 2014 WL 4347131 (D.N.M. Aug. 29, 2014)(Browning, J.).  The Court will likewise reject Cervantes-Chavez' argument on (ii) and allow the conversion of the money found at the scene to its drug-weight equivalent, as there is sufficient evidence -- from the fact that an enormous quantity of money, $19,000, was found, in cash, in a container in the same shed in which the marihuana was stowed -- that the money is "attributable to drug sales" as United States v. Rios, 22 F.3d 1024, 1027-28 (10th Cir. 1994)(Baldock, J.), requires.  The Court will also reject Cervantes-Chavez' argument on (iii) and allow the 2-level enhancement for possessing a dangerous weapon, even though that enhancement implicates an element of his crime of conviction.  The Court concluded that such an enhancement does not constitute double-counting in United States v. Sangiovanni, 2014 WL 4347131, at *4 n.5.

The Court agrees with Cervantes-Chavez' argument on (iv) and will not apply the 2-level enhancement for aggravating role, because there is insufficient evidence to establish that Cervantes-Chavez was an "organizer, leader, manager, or supervisor of one or more other

participants" as U.S.S.G. § 3B1.1 cmt. 2 (emphasis added) requires. Although the Court can apply a departure -- not an enhancement -- to a defendant who merely "exercised management responsibility over the property, assets, or activities of a criminal organization," the case must be outside the heartland to warrant a departure. Merely temporarily holding onto drugs and money -- necessary instruments of the drug trade whose handling is by no means limited to organizational higher-ups -- does not establish that this case is outside the heartland. See United States v. Anderson, 189 F.3d 1201, 1212 (10th Cir. 1999). There is no evidence here that Cervantes-Chavez organized the activities of other members of a criminal organization, nor that he had anything other than temporary custody of the necessary ingredients of a drug transaction: money and drugs.

The Court could, however, apply the role adjustment to Cervantes-Chavez even though the crime of which he was convicted is not the crime that he allegedly organized, led, managed, or supervised, because the commentary to U.S.S.G. § 3B1.1 makes it clear multiple times that all relevant conduct is considered, and does not limit -- as some other guidelines do -- the Court to facts that "the offense of conviction establishes." E.g., U.S.S.G. § 2D1.1(a)(1)-(4). Additionally, the nature of criminal organizations is that they rarely violate only one statute of the criminal code. It is not clear how the Court could delineate and enforce a rule that limited role adjustments strictly to organizations based on the crime of conviction and not on other crimes that the defendant committed. Last, regarding Cervantes-Chavez' argument on (v), the Court is aware of the impending changes to the Guidelines and will grant Cervantes-Chavez a downward variance so that his sentence is equal to that which he would receive under the impending Guidelines.

I.      **THE COURT WILL CROSS REFERENCE FROM THE ILLEGAL ALIEN-IN-POSSESSION GUIDELINE TO THE DRUG-POSSESSION GUIDELINE.**

The Court will cross reference from the guideline applicable to Cervantes-Chavez' crime of conviction -- possessing a firearm as an illegal alien -- to the drug-possession guideline, because: (i) Cervantes-Chavez' relevant conduct constitutes illegal drug possession with intent to distribute; (ii) that being the case, the Guidelines demand the cross reference; and (iii) cross referencing does not violate Cervantes-Chavez' Sixth Amendment rights.  The Court addressed issues (ii) and (iii) in United States v. Sangiovanni, in which the Court held that it would allow a cross reference from U.S.S.G. § 2K2.1 -- the same guideline applicable to Cervantes-Chavez -- to the kidnapping guideline, U.S.S.G. § 2A4.1.  See 2014 WL 4347131, at *22-26.  The Court ultimately did not cross reference to the kidnapping guideline, because Sangiovanni's relevant conduct did not satisfy the definition of kidnapping in either the federal or New Mexico statute, but it made clear that such a cross reference would have been proper if Sangiovanni's conduct had met the definition of kidnapping.  See 2014 WL 4347131, at *26-29.  The Court issued United States v. Sangiovanni earlier this year, and no relevant intervening case law has arisen in the meantime.  The Court explained that, although the decision of the Supreme Court of the United States in Alleyne v. United States, 133 S. Ct. 2151 (2013), expands the rule from Apprendi v. New Jersey, 530 U.S. 466 (2000)(holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  See 2014 WL 4347131, at *22-26.  The Court also explained its decision -- which it now repeats in this case -- for declining to follow the Tenth Circuit's unpublished

opinion in United States v. Lake, 530 F. App'x 831 (10th Cir. 2013)(unpublished).[8]  See 2014

WL 4347131, at *24-26.

---

[8]The Court gave three reasons for declining to follow the United States v. Lake:

First, the Court must keep in mind that, after the Supreme Court's holding in Alleyne v. United States, the Tenth Circuit received many habeas petitions and appeals seeking to profit from the new constitutional rule.  See United States v. Hoon, 2014 WL 3906708, at *1-2 (holding that Alleyne v. United States announces a new constitutional rule, but that it may not be applied retroactively on collateral review).  Almost every Tenth Circuit opinion citing Alleyne v. United States has been only a few pages long, unpublished, or both.  This scenario does not make for the best quality control in judicial opinions, and the Court believes that the Tenth Circuit elected not to publish United States v. Lake for a reason.

Second, the United States conceded away the central issue -- the applicability of Alleyne v. United States to Guidelines enhancements -- in United States v. Lake, and the Tenth Circuit, without conducting its own analysis, went along with it.  Without delving into the nuances of appellate procedural rules or confession of error, the Court notes that, generally, when the United States wants to concede an issue in favor of a criminal defendant, the Court will go along with it.  This rule of thumb sits at the intersection of two general jurisprudential concepts: prosecutorial discretion -- meaning that the United States can drop charges altogether if it wishes; and mutual consent -- a concept applicable to both criminal and civil cases, which provides that courts can do things that they otherwise would not do, when all parties consent to the court doing them.

Third, there is strong evidence that the United States' concession in United States v. Lake was erroneous.  The United States' representative in this case certainly seems to think so.  See Oct. 18, 2013 Tr. at 47:3-13 (Cairns)("The Government conceded the issue stupidly. Stupidly.  If I sound angry about that, I am.  I can't imagine who made that decision, but the Government conceded the issue.").  Even more importantly, the United States' representative in United States v. Lake has come to his or her senses, and also wants to take back the concession.  After the Court held both of its hearings in this case, United States v. Lake went back up on appeal, and the United States sang a different tune regarding Alleyne v. United States:

> The government in this appeal argues that its confession of error in the appeal of Ramon Lake was itself erroneous.  Shortly before the United States filed its brief in the appeal of Ramon Lake, the Supreme Court had announced its decision in Alleyne v. United States.  That case held that it was an infringement of Sixth

- 29 -

The only remaining question is whether Cervantes-Chavez' relevant conduct[9] satisfies the

drug-possession guideline's factual requirements, and the Court concludes that it does.   The

> Amendment rights for a defendant to be subjected to a higher,
> statutory minimum sentence than would otherwise have been
> applicable if the basis for the increase was not subject to a jury
> finding under the beyond a reasonable doubt standard.
>
> In the appeal of Ramon Lake, the government conceded
> that Alleyne applied not just to findings which increased the
> statutory minimum sentence, but also to findings that increased a
> defendant's advisory guidelines sentencing range.   The
> government's current position, as we understand it, is that Alleyne
> is limited to mandatory minimum sentences prescribed by statute
> and does not apply to cases like the present case, nor should it have
> applied to that of Ramon Lake.
>
> United States v. Lake, 556 F. App'x 706, 708 (10th Cir. 2014)(Holloway, J.)
> (unpublished).  The Tenth Circuit did not reach the issue of interpreting Alleyne
> v. United States -- it decided that allowing Lake to be resentenced did not work a
> manifest injustice -- but nor did it voice the slightest vote of confidence in the
> legal rule that the first United States v. Lake (possibly, weakly) articulated.
>
> The Court will thus not follow United States v. Lake, 530 F. App'x 831,
> and will rely instead on other Supreme Court and Tenth Circuit case law.  While
> the Court could not disregard a published Tenth Circuit opinion, it is also
> reluctant to not follow an unpublished Tenth Circuit opinion, and, to its memory,
> never has.  This one, however, does not appear to have "persuasive value with
> respect to a material issue in [this] case[, nor] would [it] assist the court in its
> disposition."   United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).
> Indeed, the Court concludes that it could not follow United States v. Lake without
> disregarding other Supreme Court and Tenth Circuit precedent.  So it is with full
> respect and deference, not insolence, that the Court declines to follow the case.
>
> When stripped of that one outlier, the body of case law is consistent: only
> sentencing factors that increase the mandatory minimum or maximum sentence
> need to be proven to a jury.
>
> United States v. Sangiovanni, 2014 WL 4347131, at *24-26 (emphasis in original).

[9]The Court must also determine whether Cervantes-Chavez' drug-related activities are "relevant conduct" at all, which in turn determines whether the Court can consider those facts in sentencing.  U.S.S.G. § 1B1.3.  No party before the Court argues that any of the facts in the PSR fall outside the Guidelines' definition of relevant conduct.  Relevant conduct is an expansive

drug-possession guideline applies to those who violate, among other statutes, 21 U.S.C. § 841.

Section 841 provides that "it shall be unlawful for any person knowingly or intentionally . . . to

manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or

dispense, a controlled substance." 21 U.S.C. § 841(a). Marihuana is listed as a controlled

substance throughout § 841 and the entirety of Title 21. Cervantes-Chavez was discovered

unloading 100 pounds of marihuana from a concealed compartment in a truck driven by a CI

who states that the two regularly engage in large-quantity drug transactions. See PSR ¶¶ 13-14,

at 4. Cervantes-Chavez had another seventy-five pounds of marihuana hidden in a storage shed,

along with $19,000.00 in cash. See PSR ¶ 15, at 4; id. ¶ 18, at 5. Based on this evidence, the

Court concludes that Cervantes-Chavez was engaged in violations of § 841; although the Court

---

concept that encompasses most activity that will be brought to the Court's attention in any given
case.

> Two offenses qualify as part of the "same course of conduct" if "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." We consider "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." In weighing these factors, we utilize the "sliding scale" approach mandated by U.S.S.G. § 1B1.3.

> When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity.

> [W]e have construed relevant conduct to cover a broad range of activities . . . .

United States v. Damato, 672 F.3d 832, 839-40 (10th Cir. 2012)(Lucero, J.)(quoting U.S.S.G. § 1B1.3 cmt. 9(B))(citations omitted). All three factors are present here: Cervantes-Chavez was committing the gun-possession offense and the drug offense at the same time; he possessed both items in the same place, his residence; and -- the Court finds by a preponderance of the evidence -- he committed the gun-possession offense to ensure his personal safety and otherwise aid in his continued commission of drug offenses.

need only find this violation by a preponderance of the evidence, the facts presented to the Court

would establish Cervantes-Chavez' § 841 violation by greater standards of proof.

## II. THE COURT WILL CONVERT THE $19,652.00 IN CASH FOUND AT THE SCENE TO ITS DRUG EQUIVALENT FOR THE PURPOSE OF CALCULATING CERVANTES-CHAVEZ' BASE OFFENSE LEVEL.

The Court will convert the $19,652.00 cash found at the scene of the crime to its drug-

weight equivalent of 25.4 kilograms (fifty-six pounds) of marihuana, because: (i) it is settled law

in the Tenth Circuit that drug proceeds can be converted to their drug-weight equivalent;

(ii) there is sufficient evidence to conclude that the $19,000.00 found, in cash, in the same shed

as seventy-five pounds of marihuana, "is attributable to drug sales," United States v. Rios, 22

F.3d at 1028; and (iii) there is sufficient evidence to support the $350.00/lb. conversion factor

that the USPO proposes.  A district court's power to convert drug money to its drug-weight

equivalent comes from the commentary to the drug-possession guideline:

> Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

U.S.S.G. § 2D1.1 cmt. 5.  The Honorable Bobby R. Baldock, United States Circuit Judge for the

Tenth Circuit, clarified that districts judges may convert drug proceeds to drug weight under this

provision:

> While we have never addressed whether sums of cash can be converted to drug equivalents for purposes of sentencing, today we join our sister circuits in holding that they may, so long as the quantities are determined to be relevant quantities under § 1B1.3.  See United States v. Jackson, 3 F.3d 506, 511 (1st Cir. 1993); United States v. Hicks, 948 F.2d 877, 882 (4th Cir. 1991); United States v. Gerante, 891 F.2d 364, 369 (1st Cir. 1989).  See also United States v. Rivera, 6 F.3d 431, 446 (7th Cir. 1993)(conversion of cash permissible with showing by preponderance that cash was proceeds of conspiracy's drug activity).  We find

support for this cash-to-drug-quantity conversion in commentary note [5 to] § 2D1.1 . . . .

. . . .

Thus, in a case where cash is seized and where either no drug is seized or the amount seized does not reflect the scale of the offense, the sentencing court may estimate the quantity of drugs with which Defendant was involved by converting cash to its drug equivalent, provided the court finds by a preponderance that the cash is attributable to drug sales which were part of the same course of conduct or common scheme or plan as the conviction count.

United States v. Rios, 22 F.3d at 1027-28.  See also United States v. Hinson, 585 F.3d 1328, 1341 (10th Cir. 2009)(Ebel, J.);  United States v. Jarvi, 537 F.3d 1256, 1263 (10th Cir. 2008)(McConnell, J.).

Judge Baldock's requirement that the drug sales be part of "the same course of conduct or common scheme or plan as the conviction count" is a recitation of the generic test for what portions of the defendant's conduct constitute "relevant conduct" to be considered in applying the Guidelines.  U.S.S.G. § 1B1.3(a).  The Court has already concluded that Cervantes-Chavez' drug-related conduct is relevant conduct in sentencing Cervantes-Chavez on the gun-possession crime, see supra note 9, at **Error! Bookmark not defined.**, so the only remaining question in determining whether the Court may convert the money into its drug-weight equivalent is whether it is attributable to drug sales.  Because $19,652.00 is an enormous amount of money for anyone to have on hand; because Cervantes-Chavez has advanced no alternative, licit reason for having that much cash, nor can the Court conceive of any such reason; because the cash was discovered in a container in the same shed as seventy-five pounds of marihuana;[10] and because Cervantes-

---

[10]The Court is less certain about the $652.00 found on Cervantes-Chavez' person than the $19,000.00 found in the container in the shed.  While $652.00 is still a large quantity of money to be carrying in cash, it is not beyond the pale to imagine that Cervantes-Chavez carries that quantity of cash around for personal use.  He had a legitimate job that paid him upwards of $50,000.00 per year, see PSR ¶ 56, at 10, and the fact that the cash on his person was physically

Chavez was actively engaging in a large-quantity drug transaction when he was apprehended, the Court finds that the money is attributable to drug sales.

Last, the Court finds that there is sufficient evidence to support the USPO's $350.00/lb. conversion factor.  The Court is entitled to accept facts that the USPO proposes in the PSR when no one objects to them, see United States v. Carrasco-Salazar, 494 F.3d 1270 (10th Cir. 2007), and Cervantes-Chavez has not objected to the conversion factor, see supra note 1, at 4.  Even putting aside the USPO's representation, however, the United States has independently adduced evidence in the form of testimony from Barahona -- which Cervantes-Chavez has not challenged -- supporting the $350.00/lb. conversion factor.  See Sept. 12, 2014 Tr. at Sept. 12, 2014 Tr. at 21:14-22:4 (Wang, Barahona).

## III.   THE COURT WILL APPLY THE 2-LEVEL ENHANCEMENT FOR POSSESSING A DANGEROUS WEAPON.

The Court will apply U.S.S.G. § 2D1.1(b)(1)'s 2-level enhancement for possessing a dangerous weapon.  That Cervantes-Chavez' conduct satisfies the factual requirements for the enhancement is not in dispute: he pled guilty to a crime that includes, as one of its elements, the possession of a firearm.  The only colorable argument Cervantes-Chavez can raise is that, because the facts that trigger the Guidelines enhancement were all necessary to his conviction, using them twice in this fashion constitutes impermissible double-counting.  The Court has considered this argument before, in the context of a defendant convicted of possessing a firearm as a felon and facing a cross reference to the kidnapping guideline, which, like the drug-possession guideline, contains a firearm enhancement.

---

separated from the bulk cash in the container suggests that, at the very least, it was not earmarked to be used in the same transaction.  The Court still finds that the $652.00 on Cervantes-Chavez' person was attributable to drug sales -- which, of course, are most often conducted in cash -- but the Court notes that its finding regarding this relatively small amount of money would not affect Cervantes-Chavez' Guidelines calculation in any way.

The Court notes that enhancing a conviction for being a felon in possession of a firearm with an enhancement for using a "dangerous weapon" -- a term that includes all firearms -- might constitute impermissible double-counting. E.g., United States v. Pacheco, No. CR 13-2643 JB, 2014 WL 3421063, at *9-14 (D.N.M. July 8, 2014)(Browning, J.). "Double counting occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes." United States v. Reyes Pena, 216 F.3d 1204, 1209 (10th Cir. 2000)(Kelly, J.). This case does not present the typical double counting scenario, because it involves a necessary element of the statutory offense being used to enhance the Guidelines sentence for that offense. Moreover, such an argument would fail, because the enhancement requires that "a dangerous weapon was used" in the commission of the kidnapping, U.S.S.G. § 2A4.1(b)(3) (emphasis added), which would seem to encompass a narrower swath of conduct than the statute's requirement that the defendant "ship or transport . . . or possess . . . or . . . receive any firearm," 18 U.S.C. § 922(g). Also, even if the enhancement were for mere possession of a firearm, it would probably still not constitute double counting because the provision enhances only the sentences of felons in possession of firearms who also commit kidnapping. Basically, the situation is analytically indistinct from one in which the starting offense level of the kidnapping cross reference is two points higher.

United States v. Sangiovanni, 2014 WL 4347131, at *4 n.5 (emphasis added).

The Court stands by this analysis and will add that, although the Tenth Circuit does not appear to have addressed this issue, the United States Courts of Appeals for the Second, Fifth, and Eleventh Circuits have. See United States v. Webb, 665 F.3d 1380 (11th Cir. 2012)(per curiam); United States v. Gonzales, 996 F.2d 88, 91-94 (5th Cir. 1993)(Garwood, J.)(rejecting both a double-counting and a Double-Jeopardy argument where a district court cross referenced from a conviction for possessing a firearm as a felon to the kidnapping guideline, and applied a 4-level enhancement using or possessing a firearm in connection with the kidnapping); United States v. Patterson, 947 F.2d 635, 638 (2d Cir. 1991)(Newman, J.)("The cross-reference from the gun guideline ultimately to the drug guideline initially directs the sentencing judge to the guideline for conspiracies and attempts, § 2X1.1, which includes any adjustments 'for any

intended offense conduct that can be established with reasonable certainty.' . . . [I]t was correct to add the two-level gun enhancement . . . .").

In United States v. Webb -- the most recent and most thoroughly reasoned of the three -- the defendant was convicted under the same statute as Cervantes-Chavez.[11]  The district court cross referenced to the drug-possession guideline and applied the same enhancement -- § 2D1.1(b)(1), possessing a dangerous weapon -- that the Court now considers in this case.  The Eleventh Circuit wrote:

> [W]e conclude that the application of § 2D1.1(b)(1) does not result in double counting at all.  We begin with the plain language of the guidelines, which demonstrates that the Sentencing Commission intended for the enhancement to apply.  If a defendant attempts to commit a crime while in possession of a firearm, § 2K2.1's cross-reference provision directs the court to apply the higher of the adjusted offense level as calculated under § 2K2.1 and § 2X1.1.  U.S.S.G. § 2K2.1(c)(1)(A).  Section 2X1.1, which deals with attempt crimes in general, instructs courts to apply the guideline applicable to the substantive offense when the guideline for the substantive offense expressly covers attempt crimes.  U.S.S.G. § 2X1.1(c).  Section 2D1.1, the guideline applicable to drug crimes such as Webb's, specifically covers attempt.  See U.S.S.G. §§ 2D1.1, 2X1.1, cmt. 1 (listing guideline sections that expressly cover attempts).  Under § 2D1.1, the base offense level is determined by the amount of drugs involved and is enhanced by two levels "if a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1), (c).  Therefore, because Webb possessed a firearm while attempting to engage in a drug purchase, the cross-reference provisions directed the court to apply § 2D1.1 to determine Webb's base offense level.
>
> Importantly, the guidelines instruct the court to apply § 2D1.1 in its entirety, which included any enhancements.  As the guidelines explain, "[a] cross reference . . . refers to the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references, and special instructions)." U.S.S.G. § 1B1.5(a).  In fact, as an example, the guidelines state: "if a defendant convicted of possession of a firearm by a felon, to which § 2K2.1 applies, is found to have possessed that firearm during commission of a series of offenses, the cross reference at § 2K2.1(c) is applied to the offense resulting in the greatest offense level." U.S.S.G. § 1B1.5, cmt. 3.  Thus, the Sentencing Commission intended that

_____

[11]Reginald Webb was convicted of possessing a firearm as a felon, and not of possessing one as an illegal alien, but both offenses are under 18 U.S.C. § 922(g).

a defendant would be subject to a firearm enhancement under the facts before us here.

The commentary to § 2K2.1 confirms this application of the firearm enhancement; the Commission recognized that a firearm could potentially enable other offenses, such as drug crimes, and the cross-reference provision enabled courts to take this into account. See U.S.S.G. § 2K2.1, cmt. 14(A), (C). Additionally, the guidelines specifically instruct courts to take into consideration all relevant conduct when calculating the guideline range. U.S.S.G. § 1B1.3. See United States v. Williams, 431 F.3d 767, 772-73 (11th Cir. 2005)(explaining that "cross-referenced conduct must fall under the definitions of relevant conduct found in § 1B1.3"). Here, Webb possessed a firearm while attempting to buy half a kilogram of cocaine. We cannot say that the firearm possession was irrelevant to the drug sale. See United States v. Poole, 878 F.2d 1389, 1393-94 (11th Cir. 1989)(discussing the connection between guns and drugs).

The Commission's intent is further demonstrated by other guideline sections in which the Commission chose to include language preventing double counting. United States v. Perez, 366 F.3d 1178, 1182-83 (11th Cir. 2004)(explaining that we presume the inclusion or exclusion of terms is purposeful and intentional); United States v. Brown, 332 F.3d 1341, 1346 (11th Cir. 2003)(explaining that the Sentencing Commission adopted Amendment 599 to avoid double counting in § 2K2.1(b)(5)). Thus, had the Commission not intended the § 2D1.1(b)(1) enhancement to apply to a defendant like Webb, it would have explicitly said so.

We have long approved of the sentencing scheme that subjects a defendant who possessed a firearm during another offense to a lengthier sentence than a defendant who merely possessed a gun. In United States v. Aduwo, we explained,

> a defendant who merely possesses a firearm illegally will be sentenced under § 2K2.1(a) and (b), but a defendant who then uses that weapon in another crime may be given a longer sentence under the guideline applicable to the subsequent crime instead. In this way the 2K2.1 sentencing scheme permits the sentencing court to impose a sentence which reflects the magnitude of the crime.

64 F.3d 626, 628-29 (11th Cir. 1995). Thus, Webb's conduct is precisely the type of conduct to which the Sentencing Commission intended the firearm enhancement to apply. In light of the plain language of the guidelines and the evidence of the Sentencing Commission's intent, we cannot conclude that the court here engaged in double counting.

United States v. Webb, 665 F.3d at 1382-83.  The Court agrees with the Eleventh Circuit's logic and will accordingly enhance Cervantes-Chavez' sentence 2 levels pursuant to § 2D1.1(b)(1) for his possession of a dangerous weapon.

## IV.   THE COURT WILL NOT APPLY AN AGGRAVATING ROLE ENHANCEMENT OR UPWARD DEPARTURE TO CERVANTES-CHAVEZ' SENTENCE.

The Court will not increase Cervantes-Chavez' sentence under U.S.S.G. § 3B1.1.  This question can be split into two parts: (i) whether § 3B1.1 is applicable, i.e., whether the Court can apply the guideline when Cervantes-Chavez' crime of conviction is almost certainly not itself the subject of any collective criminal activity; and (ii) whether § 3B1.1 applies, i.e., whether, assuming the Court can apply the guideline on the basis of Cervantes-Chavez' role in a criminal drug organization, he factually qualifies for the enhancement.  The Court answers yes to the first question and no to the second.  Last, the Court may depart upwards under § 3B1.1, even if the defendant did not organize or supervise other participants, if he nonetheless exercised management responsibility in a criminal organization.  The Court concludes, however, that Cervantes-Chavez' level of management responsibility is not outside the heartland of cases already covered by the substantive guideline for possessing 80-100 kilograms of marihuana with intent to sell it, and, thus, a departure is unwarranted.

### A.   THE UNITED STATES DOES NOT NEED TO PROVE THAT CERVANTES-CHAVEZ WAS AN ORGANIZER, LEADER, MANAGER OR SUPERVISOR IN HIS CRIME OF CONVICTION -- POSSESSING A FIREARM AS AN ILLEGAL ALIEN -- BUT RATHER MAY TRIGGER § 3B1.1'S AGGRAVATING ROLE ADJUSTMENT BY PROVING THAT HE WAS AN ORGANIZER, LEADER, MANAGER, OR SUPERVISOR IN AN ORGANIZATION DEVOTED TO DRUG DISTRIBUTION.

The Court may apply a role enhancement under § 3B1.1 if it is determined from Cervantes-Chavez' relevant conduct that he was an organizer, leader, manager, or supervisor of any criminal organization, whether that criminal organization's focus was drug distribution or

the possession of firearms by illegal aliens -- the former being more likely than the latter.  Before

1990, part 3B of the Guidelines opened as follows:

## PART B - ROLE IN THE OFFENSE

### *Introductory Commentary*

*This Part provides adjustments to the offense level based upon the role the defendant played in committing the offense.  When an offense is committed by more than one participant, § 3B1.1 or § 3B1.2 (or neither) may apply.  Section 3B1.3 may apply to offenses committed by any number of participants.*

**§ 3B1.1**   **Aggravating Role**

Based on the defendant's role in the offense, increase the offense level as follows:

(a)    If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b)    If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c)    If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. Part 3B (emphasis in original).

Although § 3B1.1's subsections refer to being an organizer, etc., "of a criminal activity,"

with subsection (c) going even further -- permitting the enhancement whenever a defendant was

an organizer, etc., "in any criminal activity" -- the title of the part and its introductory

commentary refer to the defendant's role in "the offense," which implies that the district court

should consider only the offense of conviction.  Courts came out different ways on this issue,

with the United States Courts of Appeals for the Third, Seventh, Ninth, Tenth, Eleventh, and

District of Columbia Circuits holding that the guideline could be applied solely based upon the crime of conviction, see United States v. Murillo, 933 F.2d 195, 199 (3d Cir. 1991)(contrasting the pre- and post-1990 interpretations of § 3B1.1); United States v. Tetzlaff, 896 F.2d 1071, 1074 (7th Cir. 1990); United States v. Streeter, 907 F.2d 781, 792 n.4 (8th Cir. 1990); United States v. Zweber, 913 F.2d 705, 709 (9th Cir. 1990); United States v. Pettit, 903 F.2d 1336, 1341 (10th Cir. 1990); United States v. De La Rosa, 922 F.2d 675, 680 (11th Cir. 1991); United States v. Williams, 891 F.2d 921, 925 (D.C. Cir. 1989), the United States Court of Appeal for the Fourth Circuit holding that district courts could consider all relevant conduct in applying role adjustments, see United States v. Fells, 920 F.2d 1179, 1184-85 (4th Cir. 1990), and the Fifth Circuit adopting a hybrid position in which district courts could consider conduct "anchored to the transaction leading to the conviction," United States v. Barbontin, 907 F.2d 1494, 1498 (5th Cir. 1990).

In 1990, however, the Commission amended the introductory commentary to part 3B, leaving the actual guideline unchanged.  See U.S.S.G. App'x C, amend. 345.  Now, in between the first and second sentences in the above-quoted, italicized commentary, is the following sentence: "The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), i.e., all conduct included under § 1B1.3(a)(1)-(4), and not solely on the basis of elements and acts cited in the count of conviction."  U.S.S.G. § 3B introductory commentary (emphasis omitted).  Every Court of Appeals -- other than the Fourth Circuit, which already considered all relevant conduct in applying role adjustments -- performed an abrupt about-face and now allows a broad inquiry into all relevant conduct when applying role adjustments.  See United States v. Laboy, 351 F.3d 578, 585-86 (1st Cir. 2003); United States v. Murillo, 933 F.2d 195, 199 (3d Cir. 1991); United States

v. Ocana, 204 F.3d 585, 591-92 (5th Cir. 2000); United States v. Mir, 919 F.2d 940 (5th Cir. 1990); United States v. Bjorkman, 270 F.3d 482, 494-97 (7th Cir. 2001); United States v. Lillard, 929 F.2d 500, 503 (9th Cir. 1991); United States v. Saucedo, 950 F.2d 1508, 1513 & n.8 (10th Cir. 1991)("The amendment clearly alters the analysis we adopted in Pettit."); United States v. Nyhuis, 8 F.3d 731, 744 (11th Cir. 1993).  The Tenth Circuit explained:

> We have reconsidered Pettit in light of the November 1990 amendment and presented this issue to the en banc court.  The court has voted unanimously that, in light of the amendment, a sentencing court may consider conduct other than that for which the defendant was convicted in determining aggravating role adjustments pursuant to U.S.S.G. § 3B1.1.

United States v. Saucedo, 950 F.2d at 1513 n.8.

In light of the 1990 amendment to part 3B's introductory commentary and the case law that interprets it, the Court may consider Cervantes-Chavez' role in -- to quote the guideline itself -- "any criminal activity" in which Cervantes-Chavez engaged, provided that it is relevant conduct.  U.S.S.G. § 3B1.1(c).  See supra note 9, at **Error! Bookmark not defined.** (concluding that Cervantes-Chavez' drug-related activity is relevant conduct for the purposes of sentencing). As a side note, the Court will point out that it would not know how to define or apply the rule that Cervantes-Chavez' requests.  The Fifth Circuit apparently adopted such a rule, see United States v. Barbontin, 907 F.2d at 1498 (1990), but the case that announced the rule did so only in broad terms, and the Guidelines amendment later that same year cut off any opportunity for the Circuit and its district courts to define the parameters of the rule, see U.S.S.G. App'x C, amend. 345.  Criminal organizations typically make their profit off of one genus or a small number of genera of crimes -- for example, the Court is willing to bet that Cervantes-Chavez' organization profits primarily from drug distribution offenses -- but they also often have a systemic propensity to commit other crimes in furtherance of their moneymaker crimes.  For example, a drug cartel

might traffic illegal guns among its members -- but not selling them to outsiders as a profit-making activity -- for protection at drug deals, or to attack or intimidate rival drug dealers.  The Court finds no basis in the Guidelines for distinguishing between the directly profitable activities of a criminal organization and auxiliary activities, and it sees no reason to invent one.  If a defendant were to be convicted of a crime totally unrelated to his larger involvement with a criminal organization -- for example, if Cervantes-Chavez were being sentenced for vehicular manslaughter for driving under the influence of alcohol -- then his involvement in the criminal organization would not be relevant conduct to the conviction, and thus could not properly be considered at sentencing.  Here, however, Cervantes-Chavez' gun possession and drug possession were both part of the same course of conduct, and the Court may apply a role adjustment if it determines that he was an organizer, leader, manager, or supervisor in a drug organization.

**B.   THERE IS INSUFFICIENT EVIDENCE TO CONCLUDE THAT CERVANTES-CHAVEZ ORGANIZED, LED, MANAGED, OR SUPERVISED OTHER PARTICIPANTS IN A CRIMINAL ORGANIZATION.**

The Court will not apply the USPO's suggested enhancement for being "an organizer, leader, manager, or supervisor," because there is insufficient evidence for the Court to conclude that Cervantes-Chavez organized, led, managed, or supervised other participants in a criminal activity. U.S.S.G. § 3B1.1.  It is clear that, if Cervantes-Chavez organized, led, managed, or supervised other participants in a criminal activity, the Court should apply a two-level enhancement.[12]  See U.S.S.G. § 3B1.1(c).  After reviewing the PSR and the transcripts of Grant's

---

[12]This theory, requiring supervision of or control over other participants, is the primary manner of triggering a § 3B1.1 enhancement.  The Court will discuss a more uncertain legal theory, in which "management responsibility" over property or assets suffices to trigger § 3B1.1, in Analysis Part IV.C.  U.S.S.G. § 3B1.1 cmt. 2.

and Barahona's testimony, however, the Court finds that there is insufficient evidence to conclude that Cervantes-Chavez had any organized participants in a shared criminal enterprise. The United States rebuts, successfully, Cervantes-Chavez' assertion that he was a mere mule -- someone who transports drugs from one location to another, is paid a small wage, has little knowledge of the greater implications of his role in the overall criminal activity, and is typically not considered a member of the larger criminal organization.  The Court finds, as the United States asks it to, that Cervantes-Chavez was a middle man -- someone who receives drugs and then sells them wholesale.  See Sept. 12, 2014 Tr. at 15:21-24 (Grant)("I believe that his source of revenue was not because he was storing [or] transferring drugs it was because he was actually wholesaling them.").  This finding, however, does not compel the conclusion that Cervantes-Chavez organized, led, managed, or supervised other participants.  It could just as easily be the case that Cervantes-Chavez purchased and sold drugs in arms-length or quasi-arms-length transactions.  The CI says that he transports drugs to Cervantes-Chavez frequently, and, given that the industry in which Cervantes-Chavez works is illegal, it is almost certainly the case that Cervantes-Chavez would have to either join or become a frequent business partner with a larger drug organization to maintain his supply chain.  Similarly, when Cervantes-Chavez sells marihuana to street-level dealers or to other wholesalers, it does not necessarily mean that he organizes, leads, manages, or supervises them any more than an agricultural conglomerate organizes, leads, manages, or supervises the large grocery chains to which it sells.

The United States had ample opportunity to present evidence about how these organizations work, and it had the chance to elicit testimony -- from two officers with experience dealing with Mexican drug organizations -- that Cervantes-Chavez would have to have had other individuals working for him, but they did not do so.  In fact, no single, identifiable individual has

been proposed to the Court as someone whom Cervantes-Chavez organizes, leads, manages, or supervises -- other than perhaps the CI, who, as far as the Court can tell, simply delivered drugs to Cervantes-Chavez at irregular intervals and helped him unload it from the truck.  There is also an important piece of circumstantial evidence in Cervantes-Chavez' favor: he has no criminal record.  See PSR ¶¶ 37-42, at 7-8.  The Court thinks it unlikely that Cervantes-Chavez got to be a higher-up in a large-scale drug organization in the United States without ever picking up a drug-related arrest along the way.  If Cervantes-Chavez had prior convictions for drug-related activity, and the relevant conduct for those convictions established that he led other members of a larger organization, then the Court could -- even though the prior convictions would not be relevant conduct in this case -- consider his role in prior crimes as evidence of his role in this crime and find that he more likely than not continued to be a leader in this case.  Here, however, there is no such evidence, and the United States has not met its burden in establishing that Cervantes-Chavez organized, lead, managed, or supervised other participants in a criminal activity.

**C.   THE COURT CAN APPLY AN UPWARD DEPARTURE UNDER § 3B1.1 COMMENT 2, EVEN IF THE DEFENDANT DID NOT ORGANIZE OR SUPERVISE OTHER PARTICIPANTS, IF HE EXERCISED MANAGEMENT RESPONSIBILITY OVER A CRIMINAL ORGANIZATION'S PROPERTY OR ASSETS; CERVANTES-CHAVEZ DOES NOT MERIT SUCH A DEPARTURE.**

An upward departure may be warranted under § 3B1.1 comment 2, even if the defendant did not organize or supervise other participants, if he exercised management responsibility over a criminal organization's property or assets.  Such a departure applies only to cases that are outside the heartland contemplated by the guideline of the substantive offense, however, and there is insufficient evidence for the Court to find that Cervantes-Chavez' exercised managerial responsibility beyond that typically exercised by a defendant sentenced under U.S.S.G. § 2D1.1(c)(8).  Section 3B1.1's commentary

provides that

> [t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.  An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. 3B1.1 cmt. 2.  The Court must determine whether the commentary's second sentence refers to § 3B1.1 or is a tangential reference to a departure found in another guideline.  This distinction matters: adjustments,[13] like those for committing an offense while possessing a dangerous weapon or causing bodily injury or death, are applied as matter of course whenever the facts indicate them; on the other hand, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline."  Koon v. United States, 518 U.S. 81, 98 (1996).

The Court concludes that the upward departure provided in § 3B1.1 comment two is applicable only when the Defendant's level of managerial responsibility is outside the heartland that the guidelines for the substantive offense contemplates.  The Court finds that Cervantes-Chavez' conduct is not out of the ordinary for defendants sentenced under § 2D1.1(c)(8), which applies to defendants who possess with intent to distribute 80-100 kilograms of marihuana.  The Court will first define the legal standard and then apply it to Cervantes-Chavez.

### 1.    The Tenth Circuit Has Not Addressed Whether a Case Must Be Outside the Heartland for § 3B1.1 Comment 2's Upward Departure to Apply.

Although the Tenth Circuit has acknowledged the upward departure language in § 3B1.1 comment 2, it has not decided whether cases must fall outside the heartland for the departure

---

[13]Upward adjustments are also referred to as enhancements.  See, e.g., U.S.S.G. § 2B1.1 cmt. 2(B); U.S.S.G. App'x C, amend. 653 ("[S]ubsection (b)(2) provided a two level enhancement if the offense involved more than 10, but less than 50, victims . . . .").

provision to apply or if the departure applies as a matter of course when "a Defendant did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets or activities of a criminal organization."  In United States v. Valdez-Arieta, 127 F.3d 1267 (10th Cir. 1997)(Ebel, J.), the Tenth Circuit held that, in applying an enhancement under §3B1.1(c), it is not required for an organizer of one or more participants to have control over one or more participants.  See 127 F.3d at 1270.  It acknowledged § 3B1.1 comment 2 provides an independent avenue for increasing a defendant's offense level, but did not determine whether a case must fall outside the heartland for this upward departure to apply.  See United States v. Valdez-Arieta, 127 F.3d at 1267-1273.

In United States v. Valdez-Arieta, the defendant  pled guilty to conspiracy to possess with intent to distribute and distribution of illegal drugs.  See 127 F.3d at 1269.  The defendant distributed cocaine, methamphetamine, and marihuana with a partner.  See 127 F.3d at 1269.  The district court enhanced the defendant's offense level by 2 levels pursuant to U.S.S.G § 3B1.1(c).  See United States v. Valdez-Arieta, 127 F.3d at 1269.  The district court found that the role adjustment "accurately reflects the defendant's 50/50 partnership with [his co-conspirator]."  127 F.3d at 1270.  The district court also found that the defendant "played a substantial role in organizing the acquiring of these drugs on a number of occasions."  127 F.3d at 1269.  The defendant argued that there was no evidence that he exercised any control over other parties to the conspiracy, and that he could not have exercised control over his co-conspirator because they acted together as joint partners.  See 127 F.3d at 1270.  The Tenth Circuit noted that the United States did not prove that the defendant exercised control over his co-conspirator or over subordinates.  See 127 F.3d at 1270.  The Tenth Circuit held, however, that an organizer is not required to exercise control over others to qualify for an enhancement

under § 3B1.1(c).  See United States v. Valdez-Arieta, 127 F.3d at 1270.  The Tenth Circuit, looking to comment 2, concluded that control is not a necessary element of an organizer under § 3B1.1(c).  See United States v. Valdez-Arieta, 127 F.3d at 1270-1271.  In other words, a defendant can be the organizer of someone over whom he does not have control.  See United States v. Valdez-Arieta, 127 F.3d at 1270-71.  The Tenth Circuit made it clear that a co-conspirator cannot shield himself from a sentence enhancement because he had an equal fifty percent participation in the criminal organization.  See United States v. Valdez-Arieta, 127 F.3d at 1272.

The Tenth Circuit acknowledged the upward departure language in comment 2 and stated: "Such language reveals an intent to allow an increased sentence under § 3B1.1 even when Defendant did not control subordinates.  We rely on 'pertinent policy' statements issued by the Sentencing Commission in 'determining the particular sentence to be imposed' under the guidelines."  United States v. Valdez-Arieta, 127 F.3d at 1271 (quoting language from 18 U.S.C. § 3553(a)(1997)).  Although the Tenth Circuit referenced comment 2, it did not decide if the § 3B1.1 upward departure applies only to cases that are outside the heartland of cases conceived by the guidelines.  See United States v. Valdez-Arieta, 127 F.3d at 1267-1273.  The Tenth Circuit used comment 2 to bolster its holding that the definition of organizer in § 3B1.1(c) does not require control over subordinates.  See United States v. Valdez-Arieta, 127 F.3d at 1272.  It did not, however, discuss the substantive standard that should apply to § 3B1.1's departure provision.  See United States v. Valdez-Arieta, 127 F.3d at 1267-1273.

In United States v. Aptt, 354 F.3d 1269 (10th Cir. 2004)(McConnell, J.), the Tenth Circuit discussed §3B1.1 comment 2's departure provision as an alternative rationale that the district court could have used had the defendant made a timely objection.  See 354 F.3d at 1277.

The Tenth Circuit did not discuss the standard that district courts must follow when applying an upward departure under §3B1.1.  See United States v. Aptt, 354 F.3d at 1285-1288.  The issue in United States v. Aptt was whether the district court erred in applying an enhancement under § 3B1.1(b).  See 354 F.3d at 1285.  The district court referred to the defendant as a "manager or supervisor of the activity," rather than a manager or supervisor of one or more participants.  354 F.3d at 1285.  Comment 2, however, says that, "to qualify for an adjustment under [§ 3B1.1], the Defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."  U.S.S.G. § 3B1.1, cmt. 2.  The Tenth Circuit found that the mere fact that the district court called the defendant a manager or supervisor of the activity, rather than a manager or supervisor of other participants, did not require reversal.  See United States v. Aptt, 354 F.3d at 1287.  There was evidence in the record that the defendant had supervised at least one participant.  See 354 F.3d at 1286-1287.  Furthermore, the defendant did not make a timely objection.  See 354 F.3d at 1287.  The Tenth Circuit noted that, if the defendant had made a timely objection to the alleged flaw in the district court's reasoning, the district court easily could have named specific participants in the fraud and money laundering that the defendant supervised.  See 354 F.3d at 1287.  Additionally, the district court could have made an equivalent departure based on the defendant's "management responsibility over the property, assets, or activities of a criminal organization."  354 F.3d at 1287 (quoting U.S.S.G. § 3B1.1, cmt. 2.).  The Tenth Circuit did not, however, address the standard that the district court should apply if it were to make this departure.  See 354 F.3d at 1287.

Although the Tenth Circuit has discussed the departure provision in § 3B1.1 comment 2, it has not determined whether a case must be outside the heartland for this provision to apply.

### 2. The Guidelines, When Read as a Coherent Whole, Indicate That the Sentencing Commission Intended for the Upward Departure Provision in Section 3B1.1 Comment 2 to Apply Only to Cases That Fall Outside the Heartland of Cases Considered by the Substantive Offense.

Section 3B1.1's commentary provides that

> [t]o qualify for an adjustment under this section, the Defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure may be warranted, however, in the case of a Defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. 3B1.1 cmt. 2. Upon first reading, the commentary appears to limit § 3B1.1's application to only those defendants who organize, lead, manage, or supervise other criminal participants. The second sentence's reference to "[a]n upward departure," then, would refer to not another way to qualify for an adjustment in this section but as permission to apply an upward departure in cases outside of the heartland in which the defendant did not organize, lead, manage, or supervise other criminal participants. Three textual inferences cut in favor of this reading. First, the provision's opening infinitive phrase, "[t]o qualify for an adjustment under this section," modifies only the remainder of the provision's first sentence and not the second sentence. It indicates that the modified clause, "the Defendant must have been the organizer, leader, manager, or supervisor of one or more other participants," is a necessary condition "to qualify for an adjustment under" § 3B1.1. Second, the use of different nouns in the two sentences -- "adjustment" in the first sentence and "departure" in the second -- implies that the two sentences are referring to different applicable standards. Third, the use of "[a]n" rather than "the" in the second sentence, especially when combined with the previously unused noun "departure," suggests that the subjects of the first and second sentence are different things. It

also suggests that "exercising management responsibility" in a criminal organization is a condition that must be satisfied to depart in § 3B1.1.

Two guidelines, however, specifically forbid district courts from applying a departure based upon the role the defendant played in committing the offense, §§ 5K2.0 and 5H1.7. The first guideline is in part 5K, the Guidelines part covering departures generally:

> (d)     PROHIBITED DEPARTURES. . . .   [T]he court may not depart from the applicable guideline range based on any of the following circumstances:
>
> . . . .
>
> (3)     The Defendant's aggravating or mitigating role in the offense, which may be taken into account only under § 3B1.1 (Aggravating Role) or § 3B1.2 (Mitigating Role), respectively.

U.S.S.G. § 5K2.0(d). The second guideline is in part 5H, the Guidelines part that specifies what characteristics of the offender the sentencing court can consider in crafting a sentence:

> Role in the Offense (Policy Statement)
>
> A Defendant's role in the offense is relevant in determining the applicable guideline range (see Chapter Three, Part B (Role in the Offense)) but is not a basis for departing from that range (see subsection (d) of § 5K2.0 (Grounds for Departures)).

U.S.S.G. § 5H1.7.

The apparent discrepancy between § 3B1.1 comment 2 and §§ 5K2.0(d) and 5H1.7 is alleviated when the Guidelines are looked at as a whole. The Guidelines were amended in 1993 to add comment 2 to § 3B1.1. See U.S.S.G. App'x C, amend. 500. Comment 2 was added to clarify "the operation of this section and to resolve a split among the courts of appeals." U.S.S.G. App'x C, amend. 500. Sections 5K2.0 and 5H1.7, on the other hand, were added in 2003, when the Commission passed an emergency amendment in response to the directives of

the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 ("PROTECT Act").  See U.S.S.G. App'x C, amend. 651.  Congress enacted the PROTECT Act, because it was concerned about district courts' increased use of downward departures.  See United States Sentencing Commission, Report to the Congress: Downward Departures from the Federal Sentencing Guidelines (In Response to Section 401(m) of Public Law 108-21) (2003)("The act was meant to substantially reduce the incidence of downward departures applied by district courts.").  The addition of these two guidelines came at a time when strict adherence to the Guidelines was required.  Because §§ 5K2.0 and 5H1.7 were added after the § 3B1.1 amendment, it can be assumed the Commission took into account the § 3B1.1 departure language when they enacted §§ 5K2.0 and 5H1.7.  Sections 5K2.0 and 5H1.7 prohibit departures regarding a defendant's aggravating role under the corresponding sections.  Section 5K2.0 specifically states that any departures concerning an aggregating role "may be taken into account only under § 3B1.1 (Aggravating Role)."  Section 5H1.7 acknowledges that a defendant's role in the offense is relevant in determining the applicable offense level, but prohibits the court from departing from the sentencing range that is laid out in § 3B1.1.

In reading all of these sections together, the Court concludes that §§ 5K2.0 and 5H1.7 limit § 3B1.1 comment 2's departure in the following ways.  First, the departure must be applied at the same point in the Guidelines sequence that a § 3B1.1 enhancement is normally applied -- after the chapter 2 offense-level provisions but before the chapter 4 and 5 provisions.[14] Second,

---

[14]This departure being exclusive to § 3B1.1 would also prevent it applying to a career offender, because § 3B1.1 is not taken into account when analyzing the offense level of a career offender.  See United States v. Nolf, No. CR 10-1919-2 JB, 2014 WL 3377695, at *13 (D.N.M. June 20, 2014)(Browning, J.)("The order of application matters: certain Guidelines provisions, such as the career offender provision at play here, intentionally subsume others . . . .").

the departure must be upward, not downward, because § 3B1.1 covers only aggravating role adjustments; § 3B1.2 covers mitigating role adjustments, and it contains no provision comparable to § 3B1.1's comment 2.  Third, the departure cannot exceed 4 offense levels, which is the maximum allowed under § 3B1.1.  Fourth, the reason for the departure must be that the defendant exercised management responsibility over the property, assets, or activities of a criminal organization.

That this departure provision is in a Guidelines part other than 5K is not unique.  See U.S.S.G. App'x at 579-81 (indexing all the departure provisions in the guidelines).  Departures of this sort occur regularly throughout the guidelines, and not just in chapter 5.  This list of departure provisions contains over fifty instances where departures are provided for in the commentary notes of the various sections.  That the departure in comment two of § 3B1.1 is included in this list provides further evidence that the departure standard applies for this provision.

The introductory commentary to the Guidelines lays out the departure standard.  See U.S.S.G. § 1A1.4(b).  It states, as part of the Guidelines' statutory mission, "[i]f . . . a particular case presents atypical features, the Act allows the court to depart from the guidelines and sentence outside the prescribed range."  U.S.S.G. § 1A1.4(b).  In the introductory commentary, the policy statement regarding departures is as follows:

> The sentencing statute permits a court to depart from a guideline-specified sentence only when it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b).  The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes.  When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

U.S.S.G. § 1A1.4(b).

The Guidelines require a case to be outside the heartland for it to be eligible for any departure.  This includes the upward departure in § 3B1.1 comment 2.

>    **3.      Cervantes-Chavez' Level of Managerial Responsibility Does Not Fall Outside the Heartland of Conduct Contemplated by the Guideline for Possessing 80-100 Kilograms of Marihuana with Intent to Distribute.**

For an upward departure to be warranted, the United States must prove that Cervantes-Chavez exercised management responsibility over the property, assets, or activities of a criminal organization above the level contemplated by  § 2D1.1(c)(8) -- the guideline for possession of 80-100 kilograms of marihuana with the intent to distribute.  The Court finds that an upward departure is not warranted, because this case does not fall outside the heartland of cases that § 2D1.1(c)(8) contemplates.

The United States' witness, Grant, characterized Cervantes-Chavez' involvement as a "distribution hub," but Grant testified that he did not recover packaging materials, drug ledgers, or bank account information from Cervantes-Chavez' residence.  Sept. 12, 2014 Tr. at 15:6-18:17 (Wang, Grant, Juarez, Court).  The only information Grant had from the CI was that the CI delivered drugs to the house where Cervantes-Chavez was arrested.  See Sept. 12, 2014 Tr. at 19:12-24 (Juarez, Grant).  The United States' other witness, Barahona, admitted that he was not aware of anyone in particular that Cervantes-Chavez was responsible for supervising.  See Sept. 12, 2014 Tr. at 26:1-13 (Juarez, Barahona, Wang, Court).  All that the United States has proven in regards to Cervantes-Chavez' management over the property is that he was in possession of 79.38 kilograms of marihuana and $19,652.00 cash, and that he helped unload a truck full of marihuana. See Sept. 12, 2014 Tr. at 18:14-19 (Juarez, Barahona); Sept. 12, 2014 Tr. at 26:1-13

(Juarez, Barahona, Wang, Court).   That, alone, is not enough to put this case outside the heartland and apply an upward departure under § 3B1.1.

Without more evidence of Cervantes-Chavez' managerial responsibility, it is hard to see how this case is outside the heartland or atypical of what the Commission contemplated for possession of 80-100 kilograms of marihuana.   For this reason, the Court will not apply the 2-level upward departure under § 3B1.1.

## V.   THE COURT WILL VARY CERVANTES-CHAVEZ' SENTENCE DOWNWARD TO MATCH THE SENTENCE HE WOULD RECEIVE WERE HE SENTENCED UNDER THE IMPENDING GUIDELINES, AND THE COURT WILL SENTENCE HIM TO 37-MONTHS IMPRISONMENT.

The Court will vary Cervantes-Chavez' sentence down to the bottom of the Guidelines range that would apply if he were sentenced under the 2014 amendments to the Guidelines, which are currently awaiting congressional approval, and sentence him to 37-months imprisonment.   Because the Court rejects the USPO's proposed 2-level role adjustment but accepts the rest of the USPO's recommendations, Cervantes-Chavez' total offense level is 23, which, when matched against his criminal history category of I, results in a Guidelines sentencing range of 46-57 months.   See PSR ¶¶ 25-35, at 6-7; U.S.S.G. § 5A.   The Court will vary downward by the equivalent of 2 offense levels to reflect that the impending Guidelines indicate a base offense level that is 2 levels lower -- 22 instead of 24 -- and would ultimately result in a total working offense level of 21.[15]   When matched against Cervantes-Chavez' criminal history category of I, this offense level results in a working Guidelines sentencing range of 37-46 months.   See U.S.S.G. § 5A.   The Court will sentence Cervantes-Chavez to the bottom

---

[15]Under the impending Guidelines, possession with intent to distribute 80-100 kilograms will carry a base offense level of 22.   See Amendments to the Sentencing Guidelines, § 2D1.1(c)(9), at 32 (Apr. 30, 2014), available at http://www.ussc.gov/guidelines-manual/ amendments-guidelines-manual (renumbering the current § 2D1.1(c)(8) as § 2D1.1(c)(9) and striking the preexisting base offense level, "24," and inserting a new base offense level, "22").

of this working range and impose a sentence of 37-months imprisonment with no term of supervised release.   The Court is cognizant that this is a varied sentence, not a Guidelines sentence, and it has also concluded that a sentence of 37-months imprisonment is sufficient but not greater than necessary to serve the purposes of 18 U.S.C. § 3553(a).

**IT IS ORDERED** that the Defendant's Exception to Pre-Sentence Report and Request for Evidentiary Hearing, filed June 27, 2014 (Doc. 20), is granted in part and denied in part.   The Court sentences Defendant Omar Cervantes-Chavez to 37-months imprisonment.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
   United States Attorney
Lynn Wei-Yu Wang
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Santiago E. Juarez
Albuquerque, New Mexico

   *Attorney for the Defendant*